DE CASTRO & DONNER SUGAR–REFIN-ING CO. (COPP v.). See Case No. 3,215.

DE CASTRO, The GOMEZ. See Case No. 5,-525.

DECATUR (BROWN v.). See Case No. 2,-001.

---

## Case No. 3,721.

### DECATUR v. CHEW.

[1 Gall. 505.][1]

Circuit Court, D. Massachusetts. Oct. Term, 1813.

DISTRIBUTION OF PRIZE MONEY — RIGHTS OF SQUADRON COMMANDER — CAPTURE BY SINGLE VESSEL.

1. The commander of a squadron, to whose command a ship of war is attached, and under whose orders she sails, is entitled to the flag twentieth of all prizes made by such ship, although the other part of the squadron may never have sailed on the cruise, in consequence of a blockade by a superior force.

[Cited in Robinson v. Hook, Case No. 11,956; U. S. v. Steever, 113 U. S. 752, 5 Sup. Ct. 768.]

2. To deprive such a commander of his flag twentieth, on account of having left his station, within the act of the 23d of April, 1800, c. 33, § 6 [2 Stat. 52], it is indispensable, that some local station should have been assigned to him.

[This was a suit in admiralty by Stephen Decatur against Thomas I. Chew.]

Mr. Selfridge, for plaintiff.
G. Blake, for defendant.

Before STORY, Circuit Justice, and DAVIS, District Judge.

STORY, Circuit Justice. This is an action for money had and received, brought by Commodore Decatur against the defendant, who is the prize agent, to recover one twentieth part of a moiety of the proceeds of the British prize ship Volunteer, captured by the frigate Chesapeake, while attached to a squadron commanded by the commodore. From the statement of facts agreed by the parties, it appears, that in the autumn of 1812, the frigate Chesapeake, commanded by Captain Evans, and the brig Argus, commanded by Captain Sinclair, and the frigate United States, commanded by Commodore Decatur, were attached together, as a squadron, under the command of the latter, by orders issued on the 9th of September from the navy de-

partment. On the 2d of October, the secretary of the navy addressed a letter to Commodore Decatur, as follows. "You will consider yourself at liberty to proceed to sea, whenever you may judge it expedient, with the vessels attached to your command. You are to do your utmost to annoy the enemy, and to afford protection to our commerce, pursuing that course, which to your best judgment may, under all circumstances, appear the best calculated to enable you to accomplish these objects, as far as may be in your power, returning into port as speedily as circumstances will permit, consistently with the great objects in view." No other orders were received or given. On the 6th of October, 1812, Commodore Decatur gave sailing orders to Capt. Evans for a cruise; but as no particular circumstances, affecting this case, grow out of their language, I forbear to recite them. These orders direct the Chesapeake to cruise between certain given latitudes and longitudes, and vest a large discretion in Captain Evans, as to deviations. Commodore Decatur soon afterwards sailed from Boston, captured the frigate Macedonian in a memorable engagement, and returned with his prize to the United States, previous to the sailing of the Chesapeake, and has ever since been unable to put to sea, in consequence of the superior blockading squadrons of the enemy. On the 28th of November, 1812, the secretary of the navy addressed a letter to Captain Evans, directing, "as soon as you shall be prepared, you will weigh anchor and proceed as you have been directed by Commodore Decatur, to whose squadron you are attached." The Chesapeake sailed about the middle of the ensuing December, captured the Volunteer, and returned from her cruise about the 10th of April, 1813, and Captain Evans immediately reported his cruise to Commodore Decatur, as his commander. The Volunteer was brought into Portsmouth, N. H., and after due proceedings, was condemned, and a moiety of the proceeds adjudged to the captors, in the district court of that district. Such are the material facts of the case, upon which a question, highly interesting to the navy, has arisen between the very meritorious officers before the court, and has been discussed with characteristic urbanity and decorum.

The act of the 23d of April, 1800, c. 33, § 6, contains the regulations relative to the distribution of prize money in the navy of the United States. The articles, on which the present controversy turns, are the first and seventh. The first declares, that the prize money shall be distributed "to the commanding officers of fleets, squadrons, or single ships, three twentieths, of which the commanding officer of the fleet or squadron shall have one twentieth, if the prize be taken by a ship or vessel acting under his command, and the commander of single ships two twentieths; but where the prize is taken by a ship acting independently of such superior

officer, the three twentieths shall belong to her commander." The seventh declares, that "no commander of a fleet or squadron shall be entitled to receive any share of prizes taken by vessels not under his immediate command, nor of such prizes, as may have been taken by ships or vessels intended to be placed under his command, before they have acted under his immediate orders; nor shall a commander of a fleet or squadron, leaving the station where he had the command, have any share of the prizes taken by ships left on such station, after he has gone out of the limits of his said command."

It is contended on behalf of the defendant (1) that the Chesapeake. at the time of the capture, was acting independently of a superior officer, within the first clause, or (2) that Commodore Decatur had left the station, where he had the command, at the time of the capture, within the seventh clause.

Before I consider these points, I will advert to the distribution of prizes under the English statutes and proclamations, because I agree with the counsel for the defendant in thinking, that they reflect light on the subject in controversy, and were obviously in the view of congress in framing our own statutes. At least as early as the year 1708 (6 Anne), one eighth of all prizes, made by ships under the command of a flag, was given to "the flag officer or officers, being actually on board, or directing or assisting in the capture" (Rob. Coll. Marit. 200, note). Upon the construction of this clause, it was held, that actual direction or assistance was not necessary; and that the mere circumstance of holding a flag commission, and the authority, in virtue thereof, to direct and assist in the operations of a fleet, was such a constructive direction and assistance, as entitled the commander to share, although he had never joined the fleet. or given any order, or done any other official act in quality of commander. In point of fact, therefore, the commander claimed his share of all prizes made. from the date of his commission to the termination thereof. This extensive right was deemed injurious to the service, and at length, in 1744, was taken from the flag officer in a variety of cases: First, where prizes were made by ships on a station "before he arrived within the limits of his command;" secondly, where prizes were made by reinforcing ships "before their arrival within the limits of his command;" and thirdly, where prizes were made by ships on a station, the flag officer of which was returning home, "after he had got out of the limits of his command." In all other cases, the right stood upon the general clause, and extended to all prizes made by ships under his command. In 1756 these restrictions were somewhat varied, and the form then adopted continued in use until the year 1803. In the regulations of 1756, the flag officer is denied a right to share, first, in prizes made by ships

on a station, where he is sent to command, "before he arrives at the place to which he is sent, and actually takes upon him the command;" secondly, in prizes made by a reinforcing squadron, before it "shall arrive within the limits of the command of the superior flag officer, and actually receive some order from him;" and thirdly, in prizes made by ships, "left behind to act under another command," when a flag officer is returning home from a station.[2]

Upon the construction of these regulations it has been held that a flag officer is not entitled, who has resigned, or accepted another distinct command, or has been superseded at the time of the capture; nor where the capturing ship has been detached by the admiralty, upon a separate service; nor where the capturing ship has made the capture without the limits of the station, without orders; nor where the flag officer has returned home for temporary purposes, leaving his squadron behind on the station; nor where there has been a temporary suspension of the command, as by the ship's going into another station for repairs, and acting, while there, under another command.[3] But in all cases, not within the exceptions of the articles of 1756. the general rule prevails, that the flag officer actually in command shall receive the flag eighth. And, therefore, if he be actually in command, he is entitled, although he has not given any orders, and the capture was made under orders from a former flag officer.[4] And it matters not, whether the actual command be by direct appointment or by devolution in the course of the service.[5] Such are the most important distinctions, which have been recognised, in the construction of the language of the prize proclamations of Great Britain. And it is impossible for the attention not to be forcibly struck with the exact resemblance, which the provisions of the act of March 2, 1799, c. 130, § 6 [1 Stat. 710], bear to these proclamations. I forbear however to comment on them, as the present question depends on another and more recent statute.

Keeping in view, however, the British decisions. let us now return to the two questions submitted to the court. And as to the first, I think it extremely clear, that in no sense could the Chesapeake be considered, at the time of the capture, as acting independently of a superior officer. She was not only attached to the squadron of Commodore Decatur, and therefore constructively under

[2] Johnstone v. Margetson, 1 H. Bl. 261; Nelson v. Tucker, 3 Bos. & P. 257, 4 East, 238.

[3] Taylor v. Pawlett (1759), and Pigot v. White (1785), cited in 1 H. Bl. 265, note; Johnstone v. Margetson. Id. 261; Nelson v. Tucker, 3 Bos & P. 257, 4 East, 238. Sed vide The St. Anne, 3 C. Rob. 60; Harvey v. Cooke. 6 East, 220; The Orion, 4 C. Rob. 302, 4 East, 232; Holmes v. Rainier. 8 East. 502.

[4] Taylor v. Pawlett and Pigot v. White, supra.

[5] Keith v. Pringle, 4 East, 262.

his command; but she had actually received his orders, and sailed in pursuance thereof on her cruise. Actual presence of the superior officer, at the time of the capture, is neither supposed nor required by the law. It is sufficient, if the ship be not detached on a separate service by the government, but remain under the command, and subject to the orders of the superior officer. In such a case, the superior officer is deemed to afford constructive assistance, and is responsible for his squadron, however far he may be removed from the scene of action. It seems to me therefore beyond all doubt, that the Chesapeake, at the time of the capture, was not acting independently, but was acting under the command of Commodore Decatur. I know not in what manner she could have assumed an independent character, unless she had been detached by the navy department from the squadron, or had thrown off the subjection to her superior by a voluntary deviation.

The second question is whether Commodore Decatur had left the station, where he had the command at the time of the capture. At the hearing, I expressed a strong opinion, that there was no foundation for the argument on this head; and. more mature reflection has satisfied me of the correctness of that opinion. In order to lay a foundation for the argument, it was necessary to show, that Commodore Decatur had a station assigned to him; for otherwise it is impossible to conceive, how he could have left it. Now in the statute, a "station" necessarily includes the idea of local limits. It presupposes certain boundaries of place and command, beyond which the squadron could not lawfully proceed in their cruise. Such is the uniform meaning of the word in the British Naval Code, and it will be difficult to assign it another meaning in our own statute, without involving absurdities in construction. Now, in point of fact, no station was assigned to Commodore Decatur. His orders were of the most unlimited nature. He was at liberty to go where he pleased, consistent with the great object of annoying the enemy.

"The world was all before him, where to choose His place of rest, and Providence his guide."

The exception then, supposed in the statute, the causa foederis, if I may use the expression, did not arise. The irresistible conclusion is. that as the exceptions of the statute do not apply, the case falls within the general rule, and Commodore Decatur is entitled to the flag twentieth of the proceeds of the captured ship. I am entirely satisfied, that judgment must pass for the plaintiff for the amount specified in the agreement of the parties. Judgment for plaintiff.